# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ERIC S. CONLEY-EAGLEBEAR,**

            Plaintiff,

v.                                              **Case No. 14-cv-1175-pp**

**FRANK MILLER,
ROB RASMUSSEN,
and KURT WAHLEN,**

            Defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40), DENYING PLAINTIFF'S MOTION TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 54), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 55), AND DISMISSING CASE

The plaintiff is a Wisconsin state prisoner, representing himself. He filed this lawsuit under 42 U.S.C. §1983, claiming that defendant City of Racine Police Officer Frank Miller used excessive force when he shot the plaintiff, that defendant City of Racine Police Officer Rob Rasmussen directed or acquiesced in the excessive use of force, and that defendant Racine Police Chief Kurt Wahlen failed to properly train his officers. Dkt. No. 8. The parties have filed cross-motions for summary judgment. For the reasons explained in this order, the court will deny the plaintiff's motion for summary judgment, and grant the defendants' motion for summary judgment.

1

**FACTS**

*A.   Preliminary Matter*

In this facts section, the court includes relevant facts from the Defendants' Proposed Findings of Fact and from the Plaintiff's Proposed Findings of Fact. The court includes only those facts that cite to supporting materials in the record. See Fed. R. Civ. P. 56(c)(1); Civil L.R. 56(b)(1)(C)(i) (E.D. Wis.). This means that the court has not included in this section many of the facts from the Plaintiff's Proposed Findings of Fact, because many of them did not cite to the record.[1] Likewise, most of the plaintiff's disputes of the defendants' proposed facts do not cite to the record as required. See Fed. R. Civ. P. 56(c)(1); Civil L.R. 56(b)(2)(B) (E.D. Wis.). The court does not include in this section the plaintiff's "disputes" that do not cite to the record.

*B.   Relevant Facts*

On June 3, 2010, at 23:12 hours, defendant Racine Police Officer Miller received a call on his personal cell phone from Officer Freidel on his work cell phone. Dkt. No. 58 ¶ 1. Officer Freidel told defendant Miller that a confidential informant had contacted him with a tip about an incident that was in progress. Id. at ¶ 2. Officer Freidel had previously contacted defendant Miller with reliable and credible information from a confidential informant. Id. at 58 ¶ 3.

Officer Freidel told defendant Miller that his confidential informant just observed a white male, who was with two white females, pull up his shirt and

---

[1] The plaintiff did file a sworn amended complaint (Dkt. No. 8) and a sworn Declaration in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 68). These filings set forth the plaintiff's version of the facts, and the court references the filings in the "Discussion" section of this order.

display a handgun tucked in his waistband. Id. at ¶ 4. Officer Freidel told defendant Miller that the white male with a gun had just left an apartment building in the 2600 block of Mt. Pleasant Street. Id. at ¶ 5. Defendant Miller told Officer Freidel that he and defendant Racine Police Officer Rasmussen already were in the area. Id. at ¶ 6. Officer Freidel asked defendant Miller to remain in the area. Id.

Defendant Miller was observing a parking lot between 2100 Romayne Avenue and 2610 Mt. Pleasant Street with a pair of binoculars. Id. at ¶ 7. Defendant Miller received several more calls from Officer Freidel at about 23:21 hours. Id. at ¶ 8. Defendant Miller observed an individual walking in the parking lot of 2610 Mt. Pleasant. Id. The individual, later identified as the plaintiff, was a white male wearing a black t-shirt and black shorts. Id. at ¶ 9. He was walking with two females. Id. All three were walking towards the entrance of 2100 Romayne Avenue. Id.

Defendant Miller noticed that as the plaintiff walked, he had his right hand in his right front pocket. Id. at ¶ 10. Defendant Miller had attended two training schools where part of the curriculum was identifying armed individuals. Id. at ¶ 11. As defendant Miller watched the plaintiff walking, he matched the behavior of what defendant Miller had been taught to look for when attempting to identify an armed individual. Id. at ¶ 12. The plaintiff walked distinctively and differently from a normal-type walk. Id. at ¶ 13. At that time, defendant Miller knew that the plaintiff had something heavy,

3

possibly a gun, in the waistband of his shorts, causing him to hold his pants up by keeping his hand in his pocket as he walked. Id. at ¶ 14.

The plaintiff admits that he had a firearm tucked in his waistband underneath his shirt while walking with the two females. Id. at ¶ 15. The plaintiff described the gun as "a .44," and stated that when it was at his waist the barrel would be at his knee. Id. at ¶ 16.

After observing how the plaintiff walked, and having considered the information received from Officer Freidel, defendant Miller decided they should stop the plaintiff and identify him for the safety of the community. Id. at ¶ 17. At 23:15 hours, while talking with Officer Freidel, defendant Miller initiated a call for service at his location for a suspicious man. Id. at ¶ 18.

Defendant Miller drove his squad into the parking lot where the plaintiff was, with his headlights and overhead lights off. Id. at ¶ 19. Defendant Rasmussen followed him into the parking lot and parked behind him. Id. Defendant Miller noticed that the plaintiff had made it to the doorway of 2100 Romayne Avenue. Id. at ¶ 20. As soon as Miller exited his squad car, the plaintiff began to run. Id. Before the plaintiff began to run, defendants Miller and Rasmussen did not see that the plaintiff had a weapon. Dkt. No. 42 at ¶ 6.

Defendant Miller yelled "stop" as the plaintiff ran toward the entrance. Dkt. No. 58 at ¶ 21. As defendant Miller entered the building, he ran past one of the females who had been with the plaintiff, and again yelled "stop." Id. at ¶ 22. The second female who had been with the plaintiff was ahead of him, and running. Id. at ¶ 23. As defendant Miller ran past her, she pushed him. Id.

4

Defendant Miller decentralized her, and continued his pursuit of the plaintiff. Id. As defendant Miller pursued the plaintiff, the plaintiff reached a second hallway and turned right down that hallway. Id. at ¶ 24. Defendant Miller was ten to fifteen feet behind the plaintiff when the plaintiff made the turn. Id. at ¶ 25. As defendant Miller made the turn, he saw the plaintiff near a set of double doors. Id. Defendant Miller saw the plaintiff exit through the doors. Id. at ¶ 26. As the plaintiff was either partially in the hallway, exiting the door, or immediately after exiting the door, the plaintiff made an extremely exaggerated draw motion with his right hand from his pants. Id. at ¶ 27. Based on his training and experience, along with the information he had received from Officer Freidel, defendant Miller believed that the plaintiff was drawing a pistol from his waistband. Id. at ¶ 28. Defendant Miller observed a gun in the plaintiff's right hand, and followed the plaintiff out the door. Id. at ¶ 29.

As defendant Miller exited the door, the plaintiff looked back at him over his right shoulder and began to turn left. Id. at ¶ 30. Defendant Miller briefly lost sight of the gun, as the plaintiff's side was now facing him in a bladed fashion. The plaintiff was still moving away from defendant Miller when this occurred. Id. at ¶ 31. Defendant Miller then noticed the barrel of the gun coming up from the plaintiff's left side as he continued to turn left. Id. at ¶ 32. The barrel of the plaintiff's gun did not make it to the point of being pointed at defendant Miller, but it appeared to be moving in that direction. Id. at ¶ 33. Defendant Miller now feared for defendant Rasmussen's and his own life, or that someone in the general area was in danger, and felt he had to take

5

immediate action. Id. at ¶ 34. At that time, defendant Miller didn't know the plaintiff's motives or intentions. Id. at ¶ 35.

Defendant Miller then discharged his firearm two times. Id. at ¶ 36. The plaintiff was about five feet from a wooden fence when defendant Miller fired. Id. at ¶ 37. The plaintiff took one more step after defendant Miller fired, and crashed into the fence. Id. The plaintiff fell face down to the ground. Dkt. No. 58 ¶ 38. After the plaintiff was on the ground, defendant Miller noticed defendant Rasmussen to his left. Id. Defendant Rasmussen began to move toward the plaintiff, in an arc toward his head. Id. at ¶ 39. Defendant Miller began to move toward the plaintiff, and as he got closer, he saw the gun lying under the backside of the plaintiff's right hand with his palm facing up. Id. at ¶ 40. Defendant Miller then recovered the gun and placed it approximately ten feet to the northeast of the plaintiff. Id. at ¶ 41.

Defendant Miller contacted dispatch and told them that they had a shots fired incident, and that he and his partner were alright, but had a white male party down. Id. at ¶ 42. Defendant Rasmussen then handcuffed the plaintiff. Id. at ¶ 43. Defendant Miller maintained custody of the plaintiff until other officers responded. Id. at ¶ 44. The plaintiff was transported to the hospital for medical attention. Id. at ¶ 45.

Defendant Miller shot the plaintiff two times in the back of his body. Dkt. No. 42 ¶ 12. Defendant Rasmussen states that when defendant Miller shot the plaintiff, he never saw a firearm in the plaintiff's hand, and the plaintiff's back was facing the defendants. Id. at ¶ 18. Defendant Miller states that when he

6

shot the plaintiff, the plaintiff was turning left toward him, and the plaintiff was sideways facing him in a bladed fashion. Id. at ¶ 19. Defendant Rasmussen states that when he ran up to the plaintiff, he observed an entry wound to the rear shoulder area and one to the left buttock. Id. at ¶ 20. Medical reports state that there are two entry wounds to the back of the plaintiff's body, one in the left buttock and one to the posterior upper arm. Id. at ¶¶ 21-22.

Defendants Miller and Rasmussen state that they were not called to the area to arrest or apprehend the plaintiff. Dkt. No. 42 ¶ 24. The plaintiff was not wanted for committing a crime on or before the chase on June 3, 2010. Id. at ¶ 25.

## DISCUSSION

*A. Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

7

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

*B.     Fourth Amendment Excessive Force Law*

The court analyzes excessive force claims relating to an arrest or other seizure under the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989). The court must engage in "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (citation and internal quotations omitted). That is, the court should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citation omitted).

A police officer's use of deadly force is a seizure under the Fourth Amendment and therefore must be reasonable. Tennessee v. Garner, 471 U.S. 1, 27 (1985). An officer may use deadly force if he has probable cause to believe

that the armed suspect (1) "poses a threat of serious physical harm, either to the officer or to others," or (2) "committed a crime involving the infliction or threatened infliction of serious physical harm" and is about to escape. Garner, 471 U.S. at 11-12; see also Weinmann v. McClone, 787 F.3d 444, 448 (7th Cir. 2014) ("[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force.").

The court's analysis of the objective reasonableness of the officer's actions must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the court must "allow for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Plumhoff v. Rickard, ___ U.S. ___, 134 S. Ct. 2012, 2020 (2014) (quoting Graham, 490 U.S. at 396-97). "What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." Weinmann, 787 F.3d at 449 (quoting Muhammed v. City of Chicago, 316 F.3d 680, 683 (7th Cir. 2002)).

C.   Discussion

    1.   Defendants Wahlen and Rasmussen Are Entitled To Summary Judgment Based on the Facts in the Record.

As an initial matter, the plaintiff concedes that he lacks evidence to support a failure-to-train claim against defendant Chief Wahlen. Dkt. No. 67 at

9

3. Accordingly, the court will grant the defendants' motion for summary judgment as to Wahlen. In addition, the record does not support a finding that defendant Rasmussen acquiesced or directed defendant Miller to shoot the plaintiff. Thus, the court will dismiss defendant Rasmussen for lack of personal involvement in the plaintiff's claim. See Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009); George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007). That leaves the plaintiff's excessive force claim against defendant Miller.

    2.    The Parties' Arguments

In support of his summary judgment motion, the plaintiff contends that "[t]he record is clear that the defendants violated [his] Fourth Amendment constitutional rights when [they] gave chase to the plaintiff and shot him two times in the back of his body." Dkt. No. 41 at 6. The plaintiff reiterates his argument in his summary judgment reply brief. Dkt. No. 63. He adds that the defendants' assertion that the plaintiff was fleeing from officers when defendant Miller shot him, and the defendants' acknowledgement that the plaintiff was shot in the back, are inconsistent with defendant Miller's statement that the plaintiff was turning toward him and facing him sideways in a bladed fashion when Miller shot the plaintiff. Dkt. No. 63 at 1-2. The plaintiff also points to the defendants' admission that he was not wanted for committing a crime prior to the June 3, 2010, incident. Finally, the plaintiff references defendant Miller's assertion that he didn't know what the plaintiff's motives or intentions were when he shot the plaintiff.

10

In his response to the defendants' summary judgment motion, the plaintiff contends that factual issues preclude summary judgment on his excessive force claim. Dkt. No. 67. He identifies three "disputed factual issues": (1) whether the plaintiff was facing the defendants when defendant Miller shot him; (2) whether the entry wounds were from the side of his body or from the back; and (3) whether the plaintiff was wanted for committing any crime before the officers pursued him. Dkt. No. 65.

The defendants filed a combined brief in response to the plaintiff's motion for summary judgment and brief in support of their own summary judgment motion. Dkt. No. 56. They contend that defendant Miller did not use excessive force when he shot the plaintiff. Rather, the defendants submit that, based on the plaintiff's actions, defendant Miller reasonably feared for his life and the lives of others, and that his use of force was justified and reasonable. The defendants also contend that they are entitled to qualified immunity.

    3.    <u>The Plaintiff Has Identified No Genuine Issues of Material Fact.</u>

The plaintiff's three "disputed factual issues" are not "material," as required by Rule 56.

First, the court concludes that a material dispute does not exist as to which way the plaintiff was facing when Miller shot him. The defendants' submissions indicate that the plaintiff began to turn toward Miller, made an exaggerated gun-drawing motion, defendant Miller saw the gun, and the plaintiff's side was facing Miller in a bladed fashion. The defendants did not assert that the plaintiff was facing Miller head-on; he had had his back to

11

Miller, and was in the process of turning when he was shot (a fact borne out by the medical records the plaintiff attached).

In contrast, the plaintiff's averments in his sworn amended complaint and his declaration conflict. In his sworn amended complaint, the plaintiff avers: "I was speaking to Jessica Hubrich on the cell phone belong[ing] to my girlfriend Renee and fleeing from the police with no gun on me and I got shot in my back two times by order of Police Officer Rasmussen[.]" Dkt. No. 8 at 5 ¶ 11. In his declaration, however, the plaintiff avers that once he exited the door into the courtyard, he

> withdrew a firearm that I had concealed in my waist band. Once I withdrew the firearm I threw it towards some bushes and continued to run to the wooden fence straight from the courtyard doors. Once I reached the wooden fence I reached my right hand upward to attempt to climb over the fence when at that moment I was shot two times.

Dkt. No. 68 at 1-2.

The court is not required to consider the facts set forth in these two filings, see McNeil v. United States, 508 U.S. 106, 113, (1993); Pearle Vision, Inc. v. Romm, 541 F.3d 751, 758 (7th Cir. 2008). The fact that the plaintiff tells two different stories in the filings supports the court's conclusion that his version of events does not raise a genuine issue of material fact regarding which way he was facing when he was shot. See Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)). And again, the fact that the plaintiff had—and admits that he had—a firearm in his waistband as he was fleeing, and that he pulled it out of his pants—and admits

12

that he did so—while he was fleeing, makes the question of which direction he was facing when Miller shot him immaterial.

Second, the defendants do not deny that defendant Miller shot the plaintiff in the back of his body. The plaintiff's medical records from his exhibits, Dkt. No. 42-1, describe the gunshot wounds as located toward the back *and* side of his body. See Dkt. No. 42-1 at 1 (shot "one time to the buttock area and once to the left arm"); Id. at 5 (gunshot wound "to the left hip"), Id. at 7 ("left thigh/buttock gunshot wound"). The evidence, and the defendants' admissions, demonstrate that both facts are true—the plaintiff had a wound to the back of his body, and one to the side. That fact is not material to the question of whether Miller used excessive force.

Finally, the defendants do not deny that the plaintiff was not wanted for committing a crime on or before the chase on June 3, 2010. Nothing in the record indicates that Miller and Rasmussen chased the plaintiff, or that Miller shot him, because of a belief that he was wanted for a crime. The reason defendant Miller fired his weapon is because he believed that the plaintiff posed a threat of serious physical harm. Thus, there is no dispute—material or otherwise—about the fact that the plaintiff was not wanted before June 3, 2010.

    4.    <u>The Defendants Are Entitled to Judgment As A Matter of Law.</u>

A plaintiff has a constitutional protection against being shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime. Weinmann, 787 F.3d at 448 (kicking down a door and

13

immediately shooting an armed suicidal person who is neither resisting arrest nor threatening anyone save himself is an excessive use of force); cf. DeLuna v. City of Rockford, 447 F.3d 1008, 1011-12 (7th Cir. 2006) (officer's use of deadly force was reasonable when suspect said "I've got something for you. You are going to have to kill me," and refused to raise his hands or stop walking toward the officer). In Garner, 471 U.S. at 21, the Court held that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect by shooting him in the back of the head while he was running away on foot, and when the officer "could not reasonably have believed that [the suspect] . . . posed any threat," and "never attempted to justify his actions on any basis other than the need to prevent an escape."

On the other hand, the Seventh Circuit has held that an officer who shoots a suspect when the suspect is reaching for his firearm exhibits a response that is "objectively reasonable," and thus cannot be found to have violated that suspect's Fourth Amendment rights. Helman v. Duhaime, 742 F.3d 760, 763 (7th Cir. 2014).

In this case, the plaintiff admits that he drew a very large gun from his waistband. The defendants' facts demonstrate that he did so in an exaggerated manner, and that he looked like he might raise the firearm toward Miller or Rasmussen. Not knowing what the plaintiff was going to do, Miller acted quickly, and fired his weapon. The plaintiff posed a serious threat of physical harm to the officers, and potentially to the community at large. Under the circumstances, defendant Miller's response was "objectively reasonable," did

14

not constitute excessive force, and did not violate the plaintiff's Fourth Amendment rights.

Because there are no genuine issues of material fact in dispute, and because the defendants are entitled to judgment as a matter of law, the court will deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment.

## CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. (Dkt. No. 40)

The court **DENIES** the plaintiff's motion to grant plaintiff's motion for summary judgment. (Dkt. No. 54)

The court **GRANTS** the defendants' motion for summary judgment. (Dkt. No. 55), and **ORDERS** that the complaint is **DISMISSED**, effective immediately.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under

15

Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate after receiving an order.

Dated in Milwaukee, Wisconsin this 17th day of February, 2016.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge

16

Case 1:14-cv-01175-PP   Filed 02/17/16   Page 16 of 16   Document 75